UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KENNETH GERSTENBERGER,

               Plaintiff,                                Case No. 08-cv-15280


                                              United States District Judge
v.                                            Paul D. Borman


HENRY FORD MACOMB HOSPITAL
CORPORATION, a Delaware Corporation,

               Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT HENRY FORD MACOMB HOSPITAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 13)

Now before the Court is Defendant Henry Ford Macomb Hospital Corporation's July 15, 2009 Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (Dkt. No. 13.) Plaintiff filed a Response. (Dkt. No. 17.) Defendants filed a Reply. (Dkt. No. 20.) A hearing on this matter was held on March 25, 2010. For the following reasons, the Court DENIES Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

## I.      BACKGROUND

Plaintiff was employed by St. Joseph's Mercy Hospital Macomb ("St. Joseph's") beginning in 1996 as a Maintenance Mechanic. (Def.'s Mot. Ex. A.) His job duties included maintaining hospital facilities, including everything from screwing in a light bulb to putting up a sign. (Pl.'s Resp. Ex. 4, Gerstenberger Dep. 54.) St. Joseph's had positions styled maintenance mechanic

"ones" and maintenance mechanic "twos," the latter having greater responsibility and higher pay. (*Id*. at 55.) As a maintenance mechanic two, Plaintiff would respond to work orders for a department that needed some type of repair, or some maintenance work. (*Id*. at 56.) Maintenance mechanics shared responsibility for all duties. (*Id*. at 54.)

Plaintiff became a lead mechanic which involved additional duties such as payroll, time card and scheduling responsibilities. (*Id*. at 60-61.) Plaintiff testified that he thought there was a difference in pay between the lead mechanic and the regular mechanics, maybe a couple of dollars, but he couldn't remember. (*Id.* at 62.) Plaintiff maintains that he performed these additional duties up until the time that Plaintiff took his medical leave. (*Id*. at 64-65.) Plaintiff received good performance evaluations in 2003 and was meeting company expectations just before he took his FMLA leave in April 2008. (Pl.'s Resp. Exs. 5, 6.)

Sodexho Inc., a management outsourcing company, had responsibility over the St. Joseph's maintenance department beginning in 2003 or 2004. (*Id.* at 50-51.) Sodexho continued to manage the maintenance department until Henry Ford Health System ("HFHS") purchased St. Joseph's Mercy Hospital of Macomb in July, 2007. (Def.'s Mot. Ex. C, Sanford Aff. ¶ 2.) Plaintiff acknowledged that HFHS took over in January, 2008. (Pl.'s Resp. Ex. 4, Gerstenberger Dep. 48.)

HFHS terminated the Sodexho maintenance department contract in January 2008 and the new operations manager, David Sanford, began auditing the department as part of HFHS's reorganization. (Def.'s Mot. Ex. C, Sanford Aff. ¶ 3.) Plaintiff assisted Mr. Sanford in auditing the maintenance department. (Pl.'s Resp. Ex. 4, Gersetenberg Dep. 88.) Mr. Sanford implemented changes which eliminated the zone organization utilized under Sodexho and instituted a structure under which all mechanics rotate shifts, with rotating lead assignments. (Def.'s Mot. Ex. C, Sanford

Aff. ¶¶ 5-6.)  This system was intended to "guarantee that each mechanic would become familiar with a variety of projects and solve the problems associated with employee absences."  (*Id*. ¶ 5.) These changes were instituted before Plaintiff took his FMLA leave and in fact, Plaintiff was on the rotation schedule for the months of January through April.  (Def.'s Mot. Ex. E; Def.'s Mot. Ex. C, Sanford Aff. ¶ 6.)

Plaintiff requested FMLA leave on March 18, 2008 for a planned total knee replacement. (Def.'s Mot. Ex. F.)  Plaintiff's leave was to begin on April 25, 2008 and continue for twelve weeks. (*Id*; Pl.'s Resp. Ex. 4, Gerstenberger Dep. 72.)  Plaintiff's doctor released him to return to work on July 20, 2008.  (Def.'s Mot. Ex. G.)  Plaintiff's first day back at work was Monday, July 21, 2008.

Plaintiff states that before he left for his FMLA leave, Mr. Sanford told him that he would regret having knee surgery, but Plaintiff claims that he did not know what Mr. Sanford meant by this statement.  (Pl.'s Resp. Ex. 4, Gerstenberger Dep. 75-77.)  Plaintiff also states that when he was off on leave he heard from certain individuals who told him that Mr. Sanford was telling people that Plaintiff's "days were numbered" and he "better watch [his] back." (*Id*. 81-82.)  Although reluctant to identify these individuals, Plaintiff did give the names of Ron Walters, Stan Bajor, Howard Thatcher and "Paul" someone.  (*Id*. 82-84.)

On Monday July 21, 2008, when Plaintiff returned to work following his FMLA leave, Mr. Sanford paged Plaintiff on his Blackberry at 7:30 or 8:00am and requested a meeting with Plaintiff. (Pl.'s Resp. Ex. 4, Gerstenberger Dep. 92-93.)  Defendant states that the purpose of the meeting was to review the department reorganization and work performance expectations.  (Def.'s Mot. 3.) Plaintiff states that when he sat down with Mr. Sanford that morning, Mr. Sanford "basically told [him] that [he] was no longer the leader of the department."  (Pl.'s Resp. Ex. 4, Gerstenberger Dep.

94.) Plaintiff states that Mr. Sanford said the reasons for his decision to divest Plaintiff of his lead mechanic responsibilities were performance related, citing work orders that Plaintiff failed to close out before his FMLA leave, scheduling issues that arose while Plaintiff was on leave and some payroll issues. (*Id*. at 94-96.) Plaintiff states that Mr. Sanford told him that the work schedule that Plaintiff had established for the time during his FMLA leave left the department short handed during Plaintiff's absence. (*Id*. at 98-99, 103.)

By both parties' accounts, the meeting between Plaintiff and Mr. Sanford on the morning of Monday July 21, 2008 became heated. Mr. Sanford states that when reminded of the mandatory, temporary shift rotation and work expectations, Plaintiff "became angry and threatening, moved closer to [Mr. Sanford], and began raising his voice and screaming." (Def.'s Mot. Ex. C, Sanford Aff. ¶ 8.) Mr. Sanford testifies that Plaintiff stated: "You can't do shit to me!" and "What's this bullshit?" (*Id*. ¶ 8.) Plaintiff admits that Mr. Sanford told Plaintiff he was getting out of control, but Plaintiff denies that he was out of control and denies that he was raising his voice or swearing. (Pl.'s Resp. 103, 105, 115.) Plaintiff characterized the exchange between himself and Mr. Sanford as "a verbal argument." (Pl.'s Compl. ¶ 3; Def.'s Mot. Ex. I, Pl.'s Answers to Interrogatories, p.2.) Plaintiff testified that he was upset by the meeting and that he kept asking Mr. Sanford if seniority meant anything, referring to Plaintiff's 13 years with the company. (*Id*. at 106-107.)

Mr. Sanford states that after he told Plaintiff to calm down multiple times, and Plaintiff refused, Mr. Sanford terminated the meeting and returned to his office. (Def.'s Mot. Ex C, Sanford Aff. ¶¶ 8-9.) Plaintiff stated that he remained in the meeting room for 5-10 minutes after Mr. Sanford left the room to "get [his] wits about him." Plaintiff stated that he was bothered because he thought the demotion would result in a two or three dollar an hour pay cut. (*Id*. at 107.)

Defendant responds that Plaintiff's pay records unequivocally demonstrate that Plaintiff was paid $27.04 per hour both prior to and after his FMLA leave.  (Def.'s Mot. Ex. M.)

After leaving the meeting with Plaintiff, Mr. Sanford telephoned Jan Harrington-Davis, Human Resource Recruiting Manager for HFHS.  (Def..'s Mot. Ex. D, Harrington-Davis Aff. ¶ 4.) Mr. Sanford explained to Ms. Harrington-Davis that Mr. Gerstenberger, a mechanic, had become insubordinate, angry, physically threatening, and unprofessional during a conversation with Mr. Sanford regarding department operations.  (*Id*. at ¶ 4.)  Mr. Sanford stated that he wanted to have a second conversation with Mr. Gerstenberger but wanted someone from Human Resources present as a precaution.  (*Id*.)

Mr. Sanford, Ms. Harrington-Davis and Joel Gibson, Vice President of Human Resources, were present for the second meeting later that morning with Mr. Gerstenberger.  (*Id*. at ¶ 5.)  Ms. Harrington-Davis testified that Mr. Gerstenberger was agitated and angry when he was called into the conference room and was red in the face, sweating, loud and cursing.  (*Id*.)  Ms. Harrington testified that when Mr. Gerstenberger arrived, she asked Mr. Sanford to repeat his review of the maintenance department operations at which time Mr. Gerstenberger stood up and accused Mr. Sanford of lying and repeatedly told him to "shut up!"  (*Id*. at ¶¶ 6-7.)  Ms. Harrington-Davis testified that she told Mr. Gerstenberger to calm down, that he would get his turn to speak, but that he was angered, extremely hostile, loud, cursing and refused to calm down.  (*Id*. at ¶ 7.)  Ms. Harrington-Davis stated that Mr. Gerstenberger warned the group that "You can't do shit to me!" and asked "What's this bullshit?"  (*Id*. at ¶ 8.)  Ms. Harrington-Davis testified that when Mr. Gerstenberger noticed her taking notes, he exclaimed: "You write this crap down; I don't care what you write down!"  He then sarcastically remarked: "You should've brought a tape recorder" and

warned again "You can't do shit to me!" (*Id*. at ¶ 9.) Ms. Harrington-Davis decided that the meeting should be terminated and concluded that Mr. Gerstenberger should be terminated for threatening and insubordinate conduct. Mr. Gibson agreed. (*Id*. at ¶¶ 10-11.) Ms. Harrington-Davis called security, called Mr. Gerstenberger in for a third meeting and told Mr. Gerstenberger that he was terminated for unprofessionalism and insubordination. (*Id*. at ¶¶ 12-13.)

Plaintiff recalls that Mr. Sanford, Ms. Harrington-Davis and Mr. Gibson were present for the second meeting, which Plaintiff recalls took place around 10:30 a.m. (Pl.'s Resp. Ex. 4, Gerstenberger Dep. 111-112.) Plaintiff admits that he told Mr. Sanford during this second meeting to "shut up" because, he states, Mr. Sanford was telling lies about what had transpired during their earlier meeting. (*Id*. at 114-115; 119; 124.) Plaintiff denies that he used foul language or raised his voice in the second meeting, or the first meeting. (*Id*. at 123.) Plaintiff states that when he was called down for the third meeting, he suspected that he was going to be fired. (*Id*. at 125-126.) He testified that they offered him the chance to resign and he told them "to take their resignation and stick it where the sun don't shine." (*Id*. at 126-127.) Plaintiff states that he doesn't believe he ever moved toward Mr. Sanford in a physical, threatening manner. (*Id*. at 127-128.)

Plaintiff had signed employment documents acknowledging his obligation to abide by all of Defendant's policies, and agreeing to conduct himself "consistent with professional standards and customer service, including being respectful, caring and accountable." (Def.'s Mot. Exs. J, K.) On August 4, 2008, HFHS sent Plaintiff a letter confirming that his termination was effective July 22, 2008 due to failure to meet professional expectations. (Def.'s Mot. Ex. L.)

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim,

or cross-claim is asserted "may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the non-moving party's case on which the non-moving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the non-moving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, *supra* 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations

or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, *supra* 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## III.    ANALYSIS

Plaintiff's FMLA claim is somewhat unique in that it involves two separate theories of recovery and two separate adverse employment actions. First, Plaintiff claims that Defendant violated FMLA by failing to restore him to the position he occupied before he took his FMLA leave (the "entitlement" or "interference" claim). Second, Plaintiff argues that Defendant violated FMLA by terminating his employment in retaliation for his opposition to Defendant's failure to restore him to the position he occupied before he took his FMLA leave – i.e. that he was terminated for expressing opposition to a discriminatory employment practice under FMLA (the "retaliation" claim).

In response to Plaintiff's entitlement/interference claim, Defendant responds that Plaintiff was restored to the same position that he occupied before he took his leave and that, even assuming he was in a different position when he returned, this was the result of a planned departmental reorganization that had nothing to do with Plaintiff's FMLA leave. In response to Plaintiff's retaliation claim, Defendant responds that Plaintiff was fired by human resources for insubordination and Plaintiff cannot establish that this basis for termination was a pretext.

"FMLA entitles an eligible employee to as many as twelve weeks of leave during any

twelve-month period if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." *Arban v. West Publishing Corp*., 345 F.3d 390, 400 (6th Cir. 2003) (citing 29 U.S.C. § 2612(a) (1)(D)). It is unlawful under FMLA for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). It is equally unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA.]" 29 U.S.C. § 2615(a)(2). Based on these provisions, the Sixth Circuit has consistently recognized two distinct theories of recovery for violations of the FMLA: (1) the so-called "entitlement" or "interference theory," arising from 29 U.S.C. § 2615(a)(1) and; (2) the "retaliation" or "discrimination theory" arising from 29 U.S.C. § 2615(a)(2). *Arban, supra* at 400-401.

The "entitlement" or "interference" theory arises from § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter," and from § 2614(a)(1), which provides that "any eligible employee who takes leave ... shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position." The "retaliation" or "discrimination" theory arises from § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

Plaintiff in the present case proceeds under both theories and claims: (1) that Defendant interfered with his rights under FMLA by failing to restore him to the position he held prior to his

FMLA leave or to an equivalent position (Count I); and (2) that Defendant terminated him for his opposition to their unlawful conduct in failing to restore him to his prior, or an equivalent, position (Count II). Defendant claims that it is entitled to Summary Judgment on both Plaintiff's interference and retaliation claims. Defendant argues: (1) that Plaintiff was restored to his prior or equivalent position, the same position to which Plaintiff would have been entitled had he not taken FMLA leave and therefore Defendant did not interfere with Plaintiff's FMLA rights; and (2) that Defendant terminated Plaintiff for insubordination, not for engaging in protected FMLA activity, and Plaintiff cannot establish that Defendant's reason for termination was a pretext.

### A. Plaintiff's Entitlement/Interference Claim

Under the entitlement theory, a plaintiff must show that the defendant " interfered with or denied them a FMLA benefit to which they would have been entitled." *Arban, supra* at 401. Plaintiff's entitlement/interference claim in the instant case is premised upon the right to be restored by the employer to the position of employment which the employee held prior to taking the FMLA leave. 29 U.S.C. §§ 2612(a)(1)(A), 2614(a)(1)(A). Plaintiff states in paragraph 22 of his Complaint that he was "entitled to the rights afforded by the provisions of FMLA, and specifically those rights enumerated in 29 USC §2614, to be restored to the position of employment held by Plaintiff when the leave commenced, or to an equivalent position." (Comal. ¶ 22.)

The entitlement theory is based upon FMLA's creation of substantive rights and is therefore not dependent on the employer's intent: "The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA - for example, a twelve-week leave or reinstatement after taking medical leave. Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the

employer." *Arban, supra* at 401.

"The substantive right to reinstatement provided in § 2614(a)(1), however, 'shall [not] be construed to entitle any restored employee to . . . any right benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave.'" *Arban, supra* at 401 (citing 29 U.S.C. § 2614(a)(3)(B)). *See also Pharakhone v. Nissan North America, Inc.*, 324 F.3d 405, 407 (6th Cir. 2003) ( "The right to reinstatement [under the FMLA] is . . . not absolute. An employer need not reinstate an employee who would have lost his job even if he had not taken FMLA leave."); *Skrjanc v. Great Lakes Power Service Co*., 272 F.3d 309, 316 (6th Cir. 2001) ( "[T]he FMLA and its implementing regulations make clear that an employee has no greater right of reinstatement than if [he] would have been continuously employed."). Of particular relevance to this matter, the regulations governing the FMLA provide that: "If a shift has been eliminated, or overtime has been decreased, an employee would not be entitled to return to work that shift or the original overtime hours upon restoration. However, if a position on, for example, a night shift has been filled by another employee, the employee is entitled to return to the same shift on which employed before taking FMLA leave." 29 C.F.R. § 825.216(a)(2).

An employee claiming that he has been denied the right to reinstatement under FMLA bears the burden of establishing "by a preponderance of the evidence, that he is entitled to the benefit he claims." *Arban, supra* at 401. "If the employer claims that the employee would have been [demoted] . . . the employee, in order to establish the entitlement protected by § 2614(a)(1), must, in the course of establishing the right, convince the trier of fact that the contrary evidence submitted by the employer is insufficient and that the employee would not have been [demoted] if he had not

taken FMLA leave." *Id.* (quoting *Rice v. Sunrise Express*, 209 F.3d 1008, 1018 (7th Cir. 2000). *See also Markos v. Mt. Brighton, Inc.*, No. 08-12588, 2009 WL 2591372 at * 9 (E.D. Mich. Aug. 24, 2009) (unpublished) (finding that while an employee has no greater protection against termination than he would have had absent the leave, (i.e. if an employee was going to be fired before he asked for leave, he can still be fired when he returns) Plaintiff met his burden of producing sufficient evidence from which a trier of fact could conclude that Plaintiff would not have been terminated if he had not requested leave).

Plaintiff argues that he was in fact demoted the day he returned from FMLA leave, that he was stripped of his responsibilities for scheduling and payroll, responsibilities that other employees were appointed to perform, and that he was told he would be taking a cut in pay. Defendant argues that, contrary to Plaintiff's assertion, Plaintiff was returned to the exact same position he held prior to beginning his FMLA leave. Defendant points out that pay records establish that Plaintiff's pay grade, $27.04 per hour, was the same both before and after his FMLA leave. (Def.'s Mot. Ex. M.) These pay records do not conclusively establish this fact, however, and Plaintiff states in his deposition that he was informed upon his return from leave that he was going to have his pay cut, although he could not recall the exact differential and has not provided any documentary evidence to substantiate this claim. He states that during the meeting on July 21, 2008 Mr. Sanford told him that his pay would be cut, but didn't tell Plaintiff what the difference would be. (Pl.'s Resp. Ex. 4, Gerstenberger Dep. 164.) Viewing the facts in the light most favorable to the Plaintiff, the Court concludes that there is a genuine issue of fact as to whether Plaintiff was returned to the exact position he held before he took the FMLA leave.

Defendant argues next that, even assuming Plaintiff was not returned to the exact same

position, any alleged change in his position was caused by a legitimate reorganization instituted prior to Plaintiff's departure and therefore Plaintiff was returned to the same position that he would have occupied had he not taken the FMLA leave and therefore cannot demonstrate that any alleged demotion was related to his FMLA leave.   (Def.'s Mot. 12.)  Defendants offer the Affidavit of David Sanford, Plaintiff's supervisor, to support the contention that a plan of reorganization was implemented before Plaintiff left for FMLA leave, which eliminated the zone organization structure under which Plaintiff had been a "lead" mechanic and instituted a new plan that now required all mechanics to rotate shifts and to rotate "lead assignments."  Defendant argues, therefore, that under the holding of *Pharakhone, supra*, Plaintiff was in the exact position he would have been in had he not taken the FMLA leave and cannot demonstrate that his claimed change in status, i.e. that he was no longer a "lead" mechanic, was related to his FMLA leave.

Plaintiff, however, denies that the zone organization/restructuring had anything to do with the change in position that was explained to him on July 21, 2008 when he returned for his FMLA leave.  Plaintiff claims, and Defendant agrees, that the new organization had been in place months before Plaintiff left for his FMLA leave, both parties relying on the work schedule indicating Plaintiff's name on the rotation schedule beginning in January 2008. (Def.'s Mot. Ex. E.)  Plaintiff claims that he was actively working within the changed system for months before his leave and never had a complaint about the new organizational structure.  In fact, in his deposition, Plaintiff testified that things were not really any different after HFHS took over than they were under Sodexho.  (Pl.'s Resp. Ex. 4, Gerstenberger Dep. 66, 71.)

Plaintiff testified that the "lead  mechanic" job responsibilities that he had before taking leave, i.e. payroll, scheduling etc., were separate and apart from the rotating assignments that

Defendant refers to and that at least two different people were doing his job when he was on FMLA leave, one doing scheduling and payroll and another doing the management-type duties, such as verifying that work orders were fully completed. (Pl.'s Resp. Ex. 4, Gerstenberger Dep. 164-165.) Plaintiff also testified that these individuals continued to perform these responsibilities after Plaintiff's termination. (*Id.* at 171.)

Plaintiff claims that the meeting on July 21, 2008 had nothing to do with the reorganization of the department but rather involved Mr. Sanford's claims that Plaintiff was not performing, or had not performed his job duties prior to his FMLA leave, as expected. Plaintiff states that Mr. Sanford addressed issues relating to some 40 work orders that Plaintiff allegedly had not completed as he should have and some failures on Plaintiff's part to appropriately schedule job assignments for the period that he was going to be gone on FMLA leave. (Pl.'s Resp. Ex. 4, Gerstenberger Dep. 94-96, 98-99, 103; Pl.'s Resp. 8-9.) This testimony is not entirely contradicted by Mr. Sanford's affidavit which states that the meeting on July 21, 2008 was "to review department operations and work performance expectations." (Def.'s Mot. Ex. C, Sanford Aff. ¶ 7.) In fact, Defendants appear to concede that performance issues were discussed at the July 21, 2008 and offer these performance issues as an alternate reason for Plaintiff's demotion upon his return from leave: "In fact, Plaintiff testified that in the review of department operations and work performance expectations with Mr. Sanford, there were a significant number of performance issues that Sanford raised with him. . . . Plaintiff offers no evidence to counter these issues, nor does he assert that those performance deficiencies fail to justify a demotion. For these additional reasons, Plaintiff cannot demonstrate a material issue of fact to withstand summary judgment." (Def.'s Reply 4-5 n. 2.)

Thus, Plaintiff disputes Defendant's claim that Plaintiff's job as lead mechanic was

eliminated by the reorganization of the department and that Plaintiff was "reassigned" upon his return from FMLA leave, i.e. experienced an adverse employment decision, pursuant to that planned reorganization. Plaintiff argues that at the meeting on July 21, 2008 he was confronted with bogus complaints about his job performance and implies that Defendant was in fact upset that he had taken leave because the department was left short-staffed. (Pl.'s Resp. Ex. 4, Gerstenberger Dep. 94-99, 101-102.) Plaintiff strongly disputes the claim that his job performance was an issue and offers his own testimony, as well as a job performance evaluation done immediately prior to his FMLA leave, which indicate that Plaintiff's supervisor was very satisfied with his work as "lead mechanic." (Pl.'s Resp. Ex. 6.) This document tends to undercut Defendant's claim that it was dissatisfied with Plaintiff's performance before he took his leave and appears to contradict Defendant's claim that under the new rotating system, which by all accounts was in place at the time of this evaluation, there was no "lead mechanic" position.

While Plaintiff does not offer any direct evidence that he lost these job responsibilities and suffered a cut in pay because he took FMLA leave, "the timing of this decision could lead a fact finder to infer that [Plaintiff] would not have been [demoted] absent [his] taking of leave." *Arban, supra* 402. Whether an employer violates FMLA on a reinstatement claim turns on why the employee was not reinstated. If the employee can show that taking leave was at least a negative factor in the employer's decision to demote him, he can show a violation of FMLA. *Pharakhone, supra* at 408. *See also Cutcher v. Kmart Corp.*, No. 09-1145, 2010 WL 346131, at * 5 (6th Cir. Feb. 1, 2010) (unpublished) (finding that plaintiff, who was terminated upon her return to work allegedly pursuant to a nationwide work force reduction, offered sufficient evidence to defeat summary judgment on her interference claim where employer offered unsubstantiated performance

issues as a basis for placing plaintiff in the category of employees who were subject to termination, concluding that: "a jury could infer that her leave status impacted her [performance] appraisal ratings, thus leading to her termination.").

Plaintiff offers his April 2008 job performance evaluation to establish that prior to his leave he was performing to expectation and Defendant has not offered any evidence to counter this claim. Neither the Sanford nor the Harrington-Davis affidavits address the issue of Plaintiff's alleged deficiencies in performance. Plaintiff claims that his demotion upon his return to work was unrelated to the new rotating work schedule, which had been in place before Plaintiff's FMLA leave and under which Plaintiff was performing without complaint. Plaintiff claims that he was told upon his return that he was performing below expectation, in particular that he had poorly scheduled coverage for the period of time that he was on FMLA leave. A reasonable jury could conclude that Plaintiff's demotion, on the very day he returned from FMLA leave, was based at least in part on his taking FMLA leave because the pre-planned reorganization alone would not have resulted in Plaintiff's demotion and none of the claimed job performance deficiencies was documented. Plaintiff claims that his supervisor was angry because the mechanics department was left short-staffed when Plaintiff and others took leave at the same time and that this was reason that Plaintiff was disciplined/demoted upon his return from FMLA leave. Viewing the facts in the light most favorable to the Plaintiff, there is a genuine issue fact as to whether Plaintiff was restored to the same position he would have occupied had he not taken FMLA leave.

### B. Plaintiff's Retaliation Claim

To establish a *prima facie* case of retaliatory discrimination under FMLA, a plaintiff must establish that: "(1) he engaged in an activity protected by the Act; (2) that this exercise of his

protected rights was known to the defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Arban, supra*, at 404. "Under the retaliation theory (also known as the discrimination theory), in contrast [to the entitlement theory], the employer's motive is an integral part of the analysis." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). The Court notes at the outset that "plaintiff's burden in establishing a *prima facie* case is not intended to be onerous." *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007). Indeed, "the burden of proof at the *prima facie* stage is minimal." *Id.* (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

A FMLA retaliation claim based upon circumstantial evidence is analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[1] *Id.* Thus, if Plaintiff can establish the elements set forth above of a *prima facie* case, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. If the defendant succeeds, the burden shifts back to the plaintiff to show that the proffered reason is a pretext for unlawful discrimination. Although the burdens of production shift, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Bryson, supra* at 570 (internal citations and quotation marks omitted).

---

[1] Were Plaintiff to submit direct evidence of discrimination, e.g. a supervisor who tells an employee that if he takes FMLA leave he will be fired, a plaintiff need not proceed under the *McDonnell Douglas* analysis and need not disprove other possible non-retaliatory reasons for the adverse action. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008). "Direct evidence does not require the fact finder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against member of the protected group." *Id.* Plaintiff has not presented such evidence in the instant case.

Section 2615(a)(2) of the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615(a)(2). Plaintiff claims that at the July 21, 2008 meetings, he was engaged in the protected activity of opposing Defendant's failure to restore him to the position he held prior to his FMLA leave and that Defendant discharged him for engaging in that protected activity.

Defendant first questions whether Plaintiff's behavior and comments at the July 21, 2008 meeting were "protected activity." Defendant argues that at most Plaintiff was complaining that he had been demoted and that he did not in any way mention that he was opposing conduct of the Defendant that was unlawful under FMLA. Defendant argues that in order for Plaintiff's comments during the July 21, 2008 meetings to be considered protected activity, Plaintiff must have specifically referenced the alleged acts of discrimination. *Fox v. Eagle Distributing Co., Inc.,* 510 F.3d 587, 592 (6th Cir. 2007) (holding, in the context of a retaliation charge under the ADEA, that statements that did not involve express allegations of discriminatory employment practices did not amount to protected activity). Plaintiff, on the other hand, argues that he was very frustrated at the meetings and was complaining about his supervisor's baseless accusations of poor performance, in particular the allegation that Plaintiff had left his employer short-handed by taking FMLA leave and failed to properly schedule coverage during his absence. Making all reasonable inferences in Plaintiff's favor, Plaintiff has sufficiently established a question of fact as to whether his complaints at the meetings on July 21, 2008 were aimed directly at Defendant's unlawful discrimination practice, i.e. demoting him the very day he returned from a 3 month FMLA leave for reasons related to his FMLA leave.

There is no question that Plaintiff suffered an adverse employment decision (termination).

The only remaining element of Plaintiff's *prima facie* case is causation. The Sixth Circuit has held that "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Bryson, supra* at 571. In the instant case, Plaintiff's protected activity (protesting his demotion for taking FMLA leave) and the adverse employment decision (termination) occurred on the very same day. For purposes of surviving summary judgment, Plaintiff has established the element of causation.

Defendant argues that, assuming Plaintiff has established a *prima facie* case of discrimination, it fired Plaintiff for insubordination based upon his unprofessional conduct at the meetings which occurred on July 21, 2008, a legitimate, non-discriminatory reason. Plaintiff does not appear to question the corporate policy that allows termination based on insubordination and thus the Court finds that Defendant has carried its burden to present evidence of a legitimate non-discriminatory reason for Plaintiff's termination. Defendant having articulated a legitimate, non-discriminatory basis, the burden shifts back to Plaintiff to establish that Defendant's proffered reason is a pretext for discrimination. To establish pretext, a plaintiff must show "'either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [his] discharge, or (3) that they were insufficient to motivate discharge.'" *Russell v. University of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) (*overruled on other grounds*, *Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009)).

Plaintiff argues that the proffered reason (insubordination) did not actually motivate the termination. Plaintiff strenuously disputes Defendant's version of what occurred at the meetings on July 21, 2008, denies that he became verbally abusive although he admits that the told his supervisor

that, if he couldn't tell the truth (about what was said in their earlier meeting) he should shut up. Plaintiff admits that he and his supervisor argued, but denies that they had an "altercation." Plaintiff denies that he lost his temper, denies that he used vulgar language or moved physically toward anyone in any of the meetings. (Pls.'s Mot. Ex. 4, Gerstenberger Dep. 103-122.)

Plaintiff argues that his conduct in the meetings did not justify his termination given the context of his only admitted comment to his supervisor that he should shut up if he could not tell the truth. (*Id*. at 130, 156-157.) Plaintiff argues that he was engaged in legitimate, protected activity and that his form of protest was not so disruptive as to lose its protected status. "[W]hether plaintiff went 'too far in [his] activities and general deportment' is essentially a factual conclusion." *Grant v. Hazelett Strip-Casting Corp*., 880 F.2d 1564, 1570 (2d Cir. 1989) (quoting *Wrighten v. Metropolitan Hospitals, Inc.,* 726 F.2d 1346, 1355 (9th Cir. 1984)) (vacating the trial court's grant of judgment notwithstanding the verdict in an age discrimination case and finding, in part, that an isolated "shouting match" was not the type of disruptive conduct that loses the protections afforded by the Act).

The record establishes that Plaintiff had a good performance history and 13 years with the company, and was fired the first day back from his FMLA leave. Although "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual . . . it is also clear that suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Deboer v. Musashi Auto Parts*, *Inc.*, 124 F. App'x 387, 393 (6th Cir. 2005) (quoting in part *Skrjanc v. Great Lakes Power Service Co*., 272 F.3d 309, 317 (6th Cir. 2001)). Such independent evidence can consist of the implausibility of an employer's proffered reason and evidence of an employee's prior excellent

performance. *Id.* Plaintiff states that his supervisor was angry with him for leaving the company short-handed when he took his FMLA leave. (Pls.'s Resp. Ex. 4, Gerstenberger Dep. 98-102.) He claims that while he was on leave, he heard from several co-workers that his supervisor was "out to get him" and "he better watch his back." (*Id.* at 81-85, 137.) Plaintiff offers a performance evaluation completed just before he took his FMLA leave that indicated Plaintiff was meeting company expectations, and that recited numerous positive comments about Plaintiff's performance. (Pls.'s Resp. Ex. 6.) Plaintiff claims that the first meeting when he arrived at work the morning he returned from his FMLA leave was a review of alleged performance deficiencies (not a mundane explanation of the rotating mechanic schedule), that he was demoted and his work conditions were materially altered at least in part because he allegedly left the company short-handed when he took his FMLA leave and that when he became upset about this discriminatory failure to return him to his pre-leave position, and voiced his opposition in the meetings on July 21, 2008, he was terminated.

While Defendant argues that the ultimate decision to terminate was made by Ms. Harrington-Davis, and that no discriminatory animus is attributed to her, the Court cannot so easily allow Defendant to shift responsibility on this issue. Plaintiff's supervisor, Mr. Sanford, was present during the meeting when Plaintiff was terminated and Ms. Harrington-Davis' Affidavit is silent on what discussions she may have had with Mr. Sanford in advance of the decision to terminate Plaintiff. "Even though the ultimate decisionmaker [may] not recall whether [she] and [p]laintiff's supervisor discussed [his] leave-taking during their conversation about [his] potential termination . . . the jury could infer that [the ultimate decisionmaker] did rely, at least in part, on [plaintiff's] FMLA usage in terminating [him]." *Bryson, supra* at 574 (quoting *Hite v. Vermeer Mfg. Co.*, 446

F.3d 858, 866 (8th Cir. 2006)).  The court must view the evidence in the light most favorable to the

non-movant, giving it the benefit of all reasonable inferences. *Fox, supra* at 592.  Viewing the facts

in the light most favorable to the Plaintiff, which the Court is obliged to do at the summary judgment

stage, the Court concludes that Plaintiff has offered sufficient evidence from which a reasonable jury

could conclude that Plaintiff was ultimately terminated by Defendant for reasons related to his

exercise of his rights under FMLA.

IV.    **CONCLUSION**[2]

For the foregoing reasons, the Court DENIES Defendant's Motion for Summary Judgment.


IT IS SO ORDERED.



S/Paul D. Borman                                    
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  April 5, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
April 5, 2010.

S/Denise Goodine                                  
Case Manager

---

[2] The Court denies Defendant's Motion for Summary Judgment based on Plaintiff' failure to timely
respond to Defendant's Request to Admit.  Defendant's have shown no prejudice as a result of
Plaintiff's delay of a little less than two months, and in fact proceeded with Plaintiff's deposition
on or about the date that responses were due, and covered all of the issues set forth in the Requests
to Admit.